UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

AKRAM MAHMOUD OMAR                                              CIVIL ACTION

VERSUS

U.S IMMIGRATION AND                              NO. 26-00443-BAJ-EWD
CUSTOMS ENFORCEMENT, ET AL.

RULING AND ORDER

Petitioner Akram Mahmoud Omar is a native Palestinian who, due to the time and place of his birth, is not a citizen of any country.[1] He moved to the United States in 1975 and has spent half a century making a life in this country with his wife and five children. Now 77 years old, he suffers from multiple serious health conditions: type II diabetes, congestive heart failure, hypertension, carotid artery disease, and chronic obstructive pulmonary disease. Incredibly, despite these undisputed facts, Immigration and Customs Enforcement ("ICE") considers Omar to be both a "flight risk" and a "priority for removal." (Doc. 26-1 at 25).

This case, like so many others around the Country, raises the "question of whether a noncitizen subject to a final order of removal and released on an order of supervision is entitled to due process when the government decides—in its discretion—to revoke that release" and take away a person's most fundamental

---

[1] Omar was born in al-Mazra'a ash-Sharqiya, West Bank, Palestine on September 4, 1948. Four months earlier, the British-administered territory of Palestine was dissolved and the state of Israel established. Omar was born into the 1948 Arab-Israeli War over the territory. When the dust settled, the West Bank and his village came under Jordanian control. Omar lived in in the West Bank until he was 17 years old, shortly before the West Bank came under Israeli occupation.

right—their liberty. "The Court answers that question simply and forcefully: Yes." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 144 (W.D.N.Y. 2025).

## I.    BACKGROUND

Omar filed a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2241 on April 27, 2026. (Doc. 1). In the Petition, he asks the Court to order his release from ICE detention in the Louisiana State Penitentiary ("LSP"), colloquially known as "Angola"—the country's largest maximum-security prison. *See Rodriguez Chavez v. Holman*, No. 25-267, 2026 WL 136902, at *3 (W.D. Pa. Jan. 20, 2026) ("[T]he facility's location at the Louisiana State Penitentiary (Angola), the largest maximum-security prison in the United States, leaves the Court with no reason to believe that his conditions of confinement are meaningfully different from criminal punishment.").

Omar was born to Palestinian parents on September 4, 1948, in the West Bank, where his family was displaced during the 1948 Arab-Israeli War. (Doc. 26-2 at 71). He appears to be among the estimated 2.3 million Palestinians, and their descendants, who were displaced during the Arab-Israeli War between 1948 and 1949.[2] Omar is thus considered "stateless," even though his area of the West Bank was controlled by the Jordanian government in 1948. (Doc. 26-2 at 4, 84). It has been under Israeli control since 1967. *Abdel-Muhti v. Ashcroft*, 314 F. Supp. 2d 418, 425

---

[2] "The Palestinians are Arabs who live in the geographical area comprising present-day Israel, the West Bank, and the Gaza Strip, or who have historical and cultural ties to that area. . . . [A]bout 2.3 million [Palestinians] are registered as refugees in their own right or as descendants of the original refugees from the 1948 Arab-Israeli War." Jim Zanotti, Cong. Research Serv., RL 34074, *The Palestinians: Background and U.S. Relations* 1 (2022) (Available at: https://www.congress.gov/crs-product/RL34074) (last visited: May 27, 2026).

(M.D. Pa. 2004) ("As a Palestinian, he is a man without a country, or a 'stateless person.'").

Omar eventually fled the West Bank with his family, and he immigrated to the United States as a lawful permanent resident in 1975. (Doc. 26-1 at 49–50). He has made his home in the United States for over 51 years now, where is married with 5 adult children, all of whom are U.S. citizens. (Doc. 26-2 at 4, 81).

In late 2005, Omar was convicted of a single nonviolent drug offense, credited with time-served, and released. (Doc. 26-1 at 57–58). Upon his release, he was immediately detained by ICE on November 9, 2005, pending removal proceedings. (Doc. 26-1 at 50–52). An immigration judge ordered Omar removed to either Ireal or Jordan on November 30, 2005. (Doc. 26-1 at 45–46; Doc. 26-2 at 86). Omar then spent nearly four months detained while ICE attempted to execute his Removal Order from November 9, 2005 to March 1, 2006. (Doc. 26-1 at 48–49; Doc. 26-2 at 45–51).

During his four months of detention in 2005 and 2006, ICE unsuccessfully attempted to remove Omar to both Israel and Jordan. (Doc. 26-2 at 56, 67, 73). On December 7, 2005, ICE sent Travel Document Requests to Israel and Jordan. (*Id.*). On December 14, 2005, the Jordanian Embassy denied ICE's request because Omar "is a Palestinian national" and there was "no proof that [he] is a Jordanian citizen." (Doc. 26-2 at 68). Israel's denial followed on January 11, 2006, explaining that a travel document could not issue for Omar because he did not have an Israeli ID Number. (Doc. 26-2 at 56, 66). In 2006, ICE headquarters acknowledged that it "cannot arrange removals to Palestine/Israel at the present time." (Doc. 26-2 at 56, 59).

3

In late February 2006, ICE conducted a Post-Order Detention Review. (Doc. 26-2 at 53–59). The reviewing officers recommended that ICE release Omar from custody on an Order of Supervision ("OSUP") because: (1) his removal was not likely to occur in the reasonably foreseeable future, given Isreal and Jordan's denial of travel document requests; and (2) because Omar's records indicated he would not "pose a threat to the safety of the community." (Doc. 26-2 at 59).

Accordingly, ICE released Omar on an OSUP March 1, 2006, after nearly four months in detention. (Doc. 26-2 at 45–51). Critical here, Omar's OSUP included a Release Notification that provided, absent a violation of the conditions of release, Omar would only be required to "surrender to ICE for removal" "[o]nce a travel document is obtained." (Doc. 26-2 at 49). Omar's OSUP also stated that when that time came, Omar would "be given an opportunity to prepare for an orderly departure." (Doc. 26-2 at 49).

Omar then returned to his family and spent the next 20 years raising his children and living at liberty in the United States. He complied with the conditions of his release and checked in with ICE as required.[3]

On October 28, 2025, Omar attended a regularly scheduled ICE check-in. However, instead of checking-in, he was arrested by ICE and detained without any warning in Pearl, Mississippi. (Doc. 26-2 at 4; Doc. 26-4). The A-File, the Government's Response, and even ICE's own Declarant all make clear that while

---

[3] In 2019, Omar was charged with misusing a trademark. He was convicted in 2022 and ordered to pay a fine of $500. ICE knew of this incident but did not consider it a violation of Omar's conditions of release or find that it otherwise warranted revocation of his OSUP, which remained in place for another 6 years until he was re-detained. (Doc. 26-1 at 25–27).

Omar was detained on October 28, 2025, he was not served with a Notice of Revocation of Release ("Notice") until December 9, 2025—42 days into his detention. (Doc. 35 at 3; Doc. 26-4; Doc. 26-1 at 25–27). That Notice stated that ICE reviewed Omar's file and determined that he would be returned to ICE custody based on: (1) his 2005 Removal Order; (2) his criminal record; and (3) ICE's determination that he was suddenly a "priority for removal." (Doc. 26-1 at 25). The Notice also stated that Omar would "promptly be afforded an informal interview at which [he] [would] be given an opportunity to respond to the reasons for revocation." (Doc. 26-1 at 25). Omar's A-File makes clear that no interview has ever taken place.

On March 24, 2026—147 days into Omar's detention at Angola and in response to Omar's request—ICE informed him that a "crossing request" was recently submitted to the Israeli government for Petitioner's "removal to [the] West Bank. Approvals range from 3-6 months." (Doc. 15-1 at 4; Doc. 12-3). This alleged crossing request is not in the record, despite the fact that the Court ordered the Government to produce "all written evidence of a deportation plan or procurement of travel documents" into the record. (Doc. 2 at 2; Doc. 26-2 at 66-74 (the A-File contains documents related to travel document requests submitted to Jordan and Israel in 2005)). ICE's Declarant, Assistant Field Office Director ("AFOD") Charles Ward, asserts, without evidentiary support, that ICE submitted the crossing request on March 4, 2026—127 days into Omar's detention at Angola. (Doc. 26-4).

On April 15, 2026, after complaining of symptoms for three weeks, Omar suffered a heart attack in ICE detention and was rushed to Lane Regional Medical

5

Center in Zachary, Louisiana, where he underwent a cardiac stent placement. (Doc. 25-1 at 4, 13; Doc. 25-2 at 38–39). That procedure was unsuccessful, however, and he underwent open heart surgery—a triple bypass—on April 22, 2026, at Our Lady of the Lake Regional Medical Center in Baton Rouge, Louisiana. (Doc. 25-6 at 44–45). After being discharged, Omar briefly returned to Angola before being admitted to Riverbridge Specialty Hospital in Vidalia, Louisiana for cardiac rehabilitation on April 28, 2026.

While undergoing cardiac rehabilitation, Omar's attorney filed a Motion for Temporary Restraining Order and Preliminary Injunction on May 12, 2026. (Doc. 12). Following its review of that Motion, the Court held a status conference on May 13, 2026. (Doc. 18). The Court then issued an Order setting a hearing for May 19, 2026, and ordered at least 48 hours' notice if Omar were to be discharged from the rehabilitation facility and, presumably, returned to an ICE detention facility, before the May 19, 2026 hearing. (Doc. 19). At the Government's request, the Court continued the hearing to May 26, 2026. (Doc. 22; Doc 23).

Omar remained at the rehabilitation facility for nearly one month before being discharged on the evening of May 23, 2026, and returned to ICE detention at the Central Louisiana ICE Processing Center in Jena, Louisiana. (Doc. 30). Despite the Court's Order, both Petitioner's Counsel and the Court learned of Omar's discharge from the rehabilitation facility at 4:30 p.m. on May 23, immediately before it occurred. Given this change in circumstances, the Court ordered the Government to be prepared to address the merits of the Habeas Petition at the May 26 hearing.

At the May 26 hearing, both sides had an opportunity to be heard. The Government filed its Response to the Petition for Writ of Habeas Corpus later that day. (Doc. 35). The Court has now fully considered the positions of both sides and the applicable law. For the given reasons below, Omar's habeas Petition will be **GRANTED**.

## II.    LEGAL STANDARD

Federal courts have authority to grant writs of habeas corpus to any person held "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). "The essence of habeas corpus is an attack by a person in custody upon the legality of that custody"; and so, to warrant relief, a petitioner must show that their detention is unlawful. *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973); *see also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001) (A district court's habeas jurisdiction extends to challenges to immigration-related detention.).

## III.    DISCUSSION

As noted, Omar has spent the majority of his life, over 51 years, in the United States. On April 22, 1975, at 26 years old, Omar arrived to the United States as a lawful permanent resident. Today, Omar is 77 years old. His wife, five adult children, and extended family reside in the United States. Omar has deeply established ties in this country that were unexpectedly cut when, as the Government puts it, ICE decided it would "***yank an alien back from release***."[4]

---

[4]  (Doc. 35 at 12 n.15 (quoting *Condecore v. Bondi*, No. 26-509, 2026 WL 1090964, at *4 (M.D. Fla. April 22, 2026) (emphasis added)).

7

In his Petition for Writ of Habeas Corpus, Omar argues that he is entitled to immediate release from ICE detention because his detention is unlawful in the following ways: (1) ICE revoked his OSUP and re-detained him without due process of law, rendering his detention unlawful at its inception; (2) Omar's prolonged detention is unconstitutional because his removal is not likely to occur in the reasonably foreseeable future; and (3) Omar's re-detention without the opportunity to prepare for an orderly departure violates due process. The Court addresses each argument in turn.

For the following reasons, the Court finds that habeas relief is warranted.

**A. Deprivation of Liberty without Due Process: OSUP Revocation.**

First, Omar argues that ICE's revocation of his OSUP was unlawful for the following reasons:

(1) ICE failed to provide Omar with an informal interview shortly after his re-detention;

(2) ICE failed to serve Omar with the Notice until nearly a month and a half after ICE detained him;

(3) once Omar received the Notice, the Notice did not provide sufficient justification for his re-detention; and

(4) there were no changed circumstances warranting his detention at the time that ICE re-detained him. (Doc. 1 at 26–27).

For the following reasons, the Court agrees and finds that Petitioner's detention was unlawful at its inception, an independent reason warranting habeas relief. *See*

8

*Rodriguez Romero*, 2026 WL 321437, at *17 ("Having found that the Government has detained Petitioners unlawfully, this Court now joins the large and growing camp of sister courts in determining that habeas relief is appropriate when ICE has detained noncitizens in violation of their constitutional rights.") (deGravelles, J.).[5]

Courts have held that "the Government has significant discretion to enforce the immigration laws and . . . to revoke an Order of Supervision. [] However, the [G]overnment's discretion to incarcerate non-citizens is always constrained by the requirements of due process." *Constantinovici v. Bondi*, 806 F. Supp. 3d 1155, 1163 (S.D. Cal. 2025) (internal citations omitted). Noncitizens, like Omar, have an "overwhelming liberty interest in their continued release under an Order of Supervision." *Rodriguez Romero*, 2026 WL 321437, at *11.[6] This liberty interest is a "weighty" one that only "strengthen[s]" with time. *Ramirez Tesara v. Wamsley*, 800 F. Supp. 3d 1130, 1136 (W.D. Wash. 2025) ("Upon [release], [petitioner] reunited with his family . . . [was] the primary breadwinner, became an active member of a local migrant support organization, and garnered considerable support from his community."); *Doe v. Becerra*, 787 F. Supp. 3d 1083, 1093 (E.D. Ca. 2025) ("The lengthy duration of his conditional release [and] the meaningful connections . .

---

[5] *See also K.E.O. v. Woosley*, No. 25-74, 2025 WL 2553394, at *7 (W.D. Ky. Sept. 4, 2025) ("As a remedy, courts across the country have ordered the release of individuals stemming from ICE's illegal detention.").

[6] *See also see also Trejo v. Warden of ERO El Paso E. Mont.*, 807 F. Supp. 3d 697, 707 (W.D. Tex. 2025) ("[Petitioner's] liberty interest is stronger than the usual *Zadvydas* petitioner . . . . After his removal order was reinstated, [petitioner] was released pursuant to an OSUP and lived at liberty in the United States for nearly six and a half years.").

. made with his community . . . create a powerful interest . . . in his continued liberty.").

Courts have further held that this "disruption of established family [and] [community] ties further compounds Petitioner's deprivation of liberty." *Tenemasa-Lema v. Hyde*, 810 F. Supp. 3d 244, 258 (D. Mass. 2025) ("We could all stand to pause for a moment and consider what it would mean, personally, to be separated from our families. Now, discount that loss by however much you think [p]etitioner's immigration status makes it actually not that big of a deal. The Court submits that there is no humane way to perform that calculus without concluding that [p]etitioner has a tremendous interest at stake here.").

Considering the liberty interests at stake, the "Government's ability to detain, release, and revoke the release of noncitizens subject to removal orders is governed by specific regulations"—relevant here, 8 C.F.R. 241.13(i). *Tran v. Blanche*, No. 25-1357, 2026 WL 1181700, at *1 (W.D. Okla. Apr. 30, 2026) (quoting *Phongsavanh v. Williams*, 809 F. Supp. 3d 864, 867 (S.D. Iowa 2025)).[7] This Court has emphasized that "courts have overwhelmingly ruled that the revocation regulations provide important procedural safeguards and are intended to protect a fundamental right derived from the constitution—liberty." *Rodriguez Romero,*

---

[7] "Section 1231(a)(3) and [its] implementing regulations govern [petitioner's] [re-]detention. Specifically, 8 C.F.R. § 241.13 governs [petitioner's] [re-]detention because [he] was re-detained after being released on an order of supervision and challenges the likelihood that he will be deported within a reasonable period of time. 8 C.F.R. § 241.13(a)." *Gomes-Afonseca v. Lyons*, No. 26-CV-10215-AK, 2026 WL 538167, at *3 (D. Mass. Feb. 26, 2026) (internal citations omitted).

2026 WL 321437, at *10. Should ICE disregard its own procedures when revoking a noncitizen's release, a person's liberty is taken from them without due process. Thus, the Fifth Amendment to the United States Constitution is violated and the profound remedy of habeas corpus is warranted. *Rodriguez Romero*, 2026 WL 321437, at *11 ("[T]his Court now joins the multitude of courts within the Fifth Circuit and across the country recognizing that non-citizens have an 'overwhelming liberty interest' in their 'continued release under [an] Order of Supervision . . . that may not be removed without due process.'"); *Thabata v. Blanche*, No. 26-531, 2026 WL 1397059, at *4 (W.D. Okla. May 19, 2026) ("When Respondents re-detained [p]etitioner on September 11, 2025, they failed to give him proper notice, or a prompt informal interview as required by 8 C.F.R. § 241.13(i). Such regulatory defects amount to due process violations that entitle a petitioner to habeas relief."). Failure to provide due process is not, as the Government boldly suggests, a "bureaucratic typo[]."[8]

### i. ICE's Failure to Provide Omar Notice and Informal Interview.

Here, Omar argues that ICE revoked his OSUP without due process because ICE failed to provide him with the Notice and an informal interview. The Government concedes both facts: (1) ICE failed to provide Omar with the Notice upon his re-detention; and (2) ICE never provided Omar with an informal interview. (Doc. 35 at 13 (acknowledging ICE's noncompliance, but arguing it is harmless); Doc. 26-4 (absent from Ward's Declaration is any assertion that ICE provided the Notice to Omar on October 28, 2025, or that Omar promptly received an informal interview);

---

[8] (Doc. 35 at 12 n.15 (quoting *Condecore v. Bondi*, No. 26-509, 2026 WL 1090964, at *4 (M.D. Fla. April 22, 2026)).

Doc. 35 at 15 ("Respondent acknowledges that there is no documentation reflecting if or when Petitioner's informal interview occurred.")).

ICE regulations provide that "[u]pon revocation, the [noncitizen] will be notified of the reasons for revocation of his or her release" and the "Service will conduct an initial informal interview promptly after his or her return to Service custody to afford the [noncitizen] an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). ICE regulations further provide that "[t]he revocation custody review will include an evaluation of any contested facts relevant to the revocation and a determination whether the facts as determined warrant revocation and further denial of release." *Id*. This ICE regulation ensures that a noncitizen whose liberty may be deprived has both notice and an opportunity to be heard—due process. Here, Omar was deprived of due process because he had neither notice nor an opportunity to be heard.

It is undisputed that ICE failed to provide Omar with the Notice found in his A-File until December 9, 2025—42 days after his re-detention on October 28, 2025. (Doc. 26-1 at 25–27). Accordingly, ICE did not provide Omar with *any* reasons for his re-detention at the time that ICE initially detained him, which deprived Omar of the opportunity to respond to or challenge ICE's decision in any way. Even if ICE had provided Omar with the reasons for his re-detention, he had no avenue by which to respond to or challenge those reasons because the informal interview mandated by ICE regulations never took place.

12

Because it is undisputed that Omar was arrested and detained without due process, this alone warrants habeas relief. *See Rodriguez Romero*, 2026 WL 321437, at \*12 ("ICE's failure to follow its own mandatory regulations (or otherwise afford [p]etitioners any meaningful notice or opportunity to be heard) in revoking supervised release was per se prejudicial. For these reasons, Petitioners are entitled to habeas relief and immediate release from detention.").[9]

---

[9] *Gurung v. Warden, S. Tex. Ice Processing Ctr.*, 2026 WL 93145, at \*4, 8 (W.D. Tex. Jan. 6, 2026) ("By failing to follow its own regulations, the Government has denied [p]etitioner notice of its intent to revoke his supervision, notice of the reasons for the revocation, and an opportunity to challenge those reasons. . . Again, the Government can have no legitimate interest in ignoring its own regulations, which are intended to ensure that the discretion afforded to the Government's agents is not exercised arbitrarily."); *Villanueva v. Tate*, 801 F. Supp. 3d. 689, 697, 704–05 (S.D. Tex. 2025) ("The regulations enacted by the [G]overnment itself are intended to ensure that noncitizens who have been released to supervision do not arbitrarily have that supervision revoked. By failing to follow its own regulations, the [G]overnment has denied [petitioner] notice of its intent to revoke his supervision, notice of the reasons for the revocation, and an opportunity to challenge those reasons." Therefore, Immediate release is "the only way to vindicate" petitioner's due process rights.); *Zhu v. Genalo*, 798 F. Supp. 3d 400, 414 (S.D.N.Y. 2025) ("ICE's failure to follow its own regulations and provide Petitioner with notice or an interview violated Petitioner's procedural due process rights.") (collecting cases); *Constantinovici*, 806 F. Supp. 3d at 1164–65 ("[W]here ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered." Here, habeas relief is warranted because "ICE did not provide [p]etitioner with a Notice of Revocation of Release until almost a month after he was taken into custody . . . . Nothing in the record indicates that [p]etitioner was provided with an interview . . . or otherwise afforded an opportunity to respond to the reasons for his re-detention."); *M.S.L. v. Bostock*, No. 25-1204, 2025 WL 2430267, at \*11 (D. Or. Aug. 21, 2025) ("Courts have found that when ICE fails to follow its own regulations in revoking release, the detention is unlawful and the petitioner's release must be ordered. More fundamentally, ICE's failure to provide [p]etitioner with a timely Notice of Revocation or conduct an informal interview until nearly a month after taking her into custody is a grave violation of [p]etitioner's due process rights in that they deprived her both of meaningful notice and an opportunity to be heard.").

**ii. Lack of Changed Circumstances at the Time of OSUP Revocation Showing Significant Likelihood of Removal in the Reasonably Foreseeable Future.**

Omar also argues that ICE wrongfully revoked his OSUP because at the time of his re-detention, October 28, 2025, there were no changed circumstances showing a significant likelihood of his removal in the reasonably foreseeable future. The Government does not directly respond to Omar's claim or otherwise address the foreseeability of removal at the time of Omar's re-detention—*i.e.*, as of October 28, 2025. Instead, the Government focuses on the present, arguing without evidentiary support that "the United States has detained Petitioner to effectuate his removal" and "ICE is prepared to remove the Petitioner to the West Bank via Israel next month (June)." (Doc. 35 at 9).

ICE regulations provide that ICE may revoke a noncitizen's OSUP and "return [them] to custody if, on account of changed circumstances, the Service determines that there is a significant likelihood that the [noncitizen] may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(2). This Court has explained that "in order to re-detain a formerly released noncitizen, it is ICE's burden to show that the noncitizen's removal from the country is significantly likely to occur in the reasonably foreseeable future." *Rodriguez Romero*, 2026 WL 321437, at *5.[10] To satisfy its burden, ICE must conduct an individualized assessment. *Id.* at *6 ("[F]or

---

[10] S*ee also Garcia-Aleman v. Thompson,* No. SA-25-CV-886-OLG (HJB), 2025 WL 3534806, at *4 (W.D. Tex. Nov. 24, 2025), *report and recommendation adopted,* No. SA-25-CV-00886-OLG, 2025WL 3532179 (W.D. Tex. Dec. 9, 2025) ("[I]t is [r]espondents' burden to show a significant likelihood that [p]etitioner may be removed.") (citing 8 C.F.R. § 241.13(i)(2) (collecting cases)).

the purpose of effectuating deportation, ICE must find a significant likelihood of removal as to the individual noncitizen in question.").

Critical here, the "changed circumstances that make a noncitizen's removal likely in the foreseeable future must have existed at or before the OSUP revocation; post-hoc justifications are inadequate." *Id.* at \*5; *see also Munagi v. McDonald*, 813 F. Supp. 3d 225, 228 (D. Mass. 2025) ("Before revoking an OSUP . . . ICE must determine that . . . [removal] has become significantly likely . . . ICE must make that determination in the first instance, rather than the Court.").

Here, the Notice ICE eventually provided to Omar fails to provide any changed circumstances existing at the time of Omar's re-detention indicating that his removal was reasonably foreseeable. The Notice further fails to indicate whether ICE made any kind of individualized assessment to find that Omar's removal was reasonably foreseeable. Instead, the Notice simply explains that Omar has "been determined to be a priority for removal." (Doc. 26-1 at 25–27). The Notice also references, without explanation, Omar's 2005 Removal Order and criminal history, both of which have gone unchanged for years, if not decades.

ICE's proffered reasons provided in the Notice simply do not constitute changed circumstances of any kind, let alone changed circumstances that make Omar's removal significantly likely in the foreseeable future. This failure by ICE provides another independent reason warranting Omar's immediate release. *See Rombot v. Souza*, 296 F. Supp. 3d 383, 387 (D. Mass. 2017) (ordering petitioner's release where there was no record of requisite findings being made before re-

15

detention and OSUP revocation); *Abuelhawa v. Noem*, 811 F. Supp. 3d 847, 859–61, 863–64 (S.D. Tex. 2025) (ordering immediate release of petitioner where the notice provided lacked specific changed circumstances).

The Court pauses to question why ICE now considers Omar—a 77-year-old with hypertension, diabetes, congestive heart failure, and hearing loss, who recently underwent triple bypass open heart surgery, and has lived in the U.S. for over 51 years a "priority for removal[,]" when ICE has not considered him a priority for removal for the last 20 years.

### a. Lack of Evidence Supporting Foreseeability of Removal.

The Declaration of AFOD Ward, and the entirety of the record, establish that changed circumstances making Omar's removal reasonably foreseeable could not have existed on or before his October 28, 2025 re-detention. At the outset of this litigation, the Court ordered the Government to file Omar's "complete A-File, . . . and all written evidence of a deportation plan or procurement of travel documents" into the record. (Doc. 2 at 2). Despite the Court's Order, the record does not contain a single document purporting to be a request for travel documents submitted by ICE to any country prior to or at the time of Omar's re-detention. In fact, there is not a single request for travel documents—including a crossing request—since Omar was detained 213 days ago.

The only notation in the record regarding the foreseeability of Omar's removal is ICE's March 24, 2026 response to Omar's request for information, provided below:

16

RESPONSE (RESPUESTA): *NO UPDATE. CROSSING REQUEST SUBMITTED TO GOV. OF ISRAEL FOR REMOVAL TO WEST BANK.*

*APPROVALS RANGE FROM 3-6 MONTHS*

(Doc. 12-3; 26-4 at 1).[11] According to the Declaration of AFOD Ward, the referenced "crossing request" was submitted to Israel on March 4, 2026, 127 days after ICE detained Omar:

> On March 4, 2026, ICE submitted a crossing request to the Government of Israel for permission to transit the petitioner for removal to the West Bank. These crossing request approvals currently take between 3-6 months.

(Doc. 26-4 at 1). But this crossing request does not exist in the record.

ICE's alleged March 4, 2026 crossing request to Israel—one that ICE knew would take another three to six months for approval (if any)—does not constitute changed circumstances justifying Omar's re-detention that existed on October 28, 2025. *See Munagi v. McDonald*, 813 F. Supp. 3d 225, 228, 229 (D. Mass. 2025) ("As for the newly obtained travel documents, ICE did not apply for such documents until after it had revoked Munagi's supervised release. The question before the Court is not whether petitioner's deportation is now likely in the reasonably foreseeable future but whether such likelihood existed at the time his OSUP was revoked. The government has proffered no evidence demonstrating the latter.").

---

[11] This "Detainee Request to ICE" form is not found in the A-File or any of the documents supplied by the Government, despite the Court's Order requiring the production of all documents related to the foreseeability of removal. (Doc. 5). It was only provided to the Court by Omar.

ICE detained Omar at his annual ICE check-in—the same check-in Omar had complied with for the previous 20 years. In the one year leading up to Omar's October 28, 2025 ICE check-in, ICE failed to take any action to secure travel documents or otherwise effectuate Omar's removal. In the 20 years leading up to Omar's October 28, 2025 detention by ICE, ICE similarly failed to take a single step towards securing travel documents or otherwise effectuating Omar's removal. Instead, ICE waited until the 127th day of Omar's ICE detention—largely at Angola, a maximum-security prison—to submit an alleged crossing request for Omar.[12] Again, the only indication of such a crossing request in the record is an ICE Officer's word—no documentation exists proving this fact.

Omar has now been detained for 213 days, and there is no indication that he is any closer to removal today than he was on October 28, 2025, when ICE detained him, or even 20 years ago. This cannot stand. *See Douglas v. Baker*, 812 F. Supp. 3d 525, 532 (D. Maryland Oct. 24, 2025) ("[T]he deference baked into the *Zadvydas* standard does not permit the [G]overnment to detain a noncitizen and then

---

[12] Aside from the gross violation of Omar's constitutional right to liberty, ICE's arbitrary conduct also comes at great expense to the American taxpayer. "Recent estimates by the federal government find that supervised release programs . . . cost less than $4.20 each day per participant, compared with detention costs of $152 per day." *Jacobo Ramirez v. Mullin*, No. 25-2136, 2026 WL 879799, at *30 (D. Nev. Mar. 30, 2026). Therefore, in the 127 days it incarcerated Omar before even submitting a crossing request to Israel—a crossing request that ICE knew would take another 3-6 months (on average) for response—ICE unnecessarily cost taxpayers an estimated $19,304.00. This is not to mention the remainder of Omar's unlawful time in detention—86 days (and counting) at a cost of $13,072.00—or the substantial costs of medical treatment that ICE chose to incur by continuing to detain Omar despite his age, severe chronic health conditions, and ICE's inability to carry out his removal. Even still, the cost to Omar and his family is immeasurable.

sit on its hands. Such inaction, or lack of progress in effectuating removal, is precisely what *Zadvydas* forbids.").

### b. The Government's Belated Assertions Regarding Omar's Alleged Forthcoming Removal Do Not Persuade Otherwise.

Even if the Government's alleged recent efforts could be used to justify the revocation of Omar's release, habeas relief would still be warranted. AFOD Ward's Declaration explains that:

> ICE has a scheduled date in the month of June to remove the Petitioner to the West Bank via Israel.

> ICE does not require travel documents for this removal (beyond the Petitioner's ID which was approved by Israel) because it is not a commercial flight to Israel.

(Doc. 26-4 at 1). Nothing in the record shows that Israel has approved Omar's "ID"[13] or the alleged March 4th crossing request, or that Israel has otherwise agreed to accept Omar and transport him to the West Bank.[14] *Shabana v.*

---

[13] Because the Government failed to provide sufficient documentation, the Court can only presume the referenced ID is a U.S. form of identification, as Omar is a stateless Palestinian and the record contains only U.S. forms of identification (Doc. 26-1 at 128, 140), (Doc. 26-2 at 13). The record does, however, confirm that Omar does not have an Israeli ID Number. (Doc. 26-2 at 56).

[14] But again, even if travel documents were no longer needed—better yet, even if they had been obtained—and the Government provided a flight manifest showing Omar would be removed on a concrete date in June, none of this would have occurred until **months after** ICE re-detained him on October 28, 2025. Again, the question is not whether Omar's deportation is now likely, "but whether such likelihood existed at the time his OSUP was revoked." *Rodriguez Romero*, 2026 WL 321437, at *5; *Munagi*, 813 F. Supp. 3d at 229 ("As for the newly obtained travel documents, ICE did not apply for such documents until after it had revoked Munagi's supervised release."); *Truong v. Noem*, No. 25-2597, 2025 WL 2988357, at *5 (S.D. Cal. Oct. 22, 2025) (Although "the necessary travel document from Laos" was obtained around September 24, 2025, "and Petitioner's anticipated departure [would] occur on or before November 1, 2025," the Court granted habeas and ordered his immediate release because the Government's "recent efforts" could not be used "to justify the revocation of

*Sec'y, U.S. Dep't of Homeland Sec.*, No. 26-805, 2026 WL 1453390, at *2 (M.D. Fla. May 22, 2026) ("Respondents argue that it made a single crossing request to the Israeli government and thus, 'there is a significant likelihood that [p]etitioner will be removed in the reasonably foreseeable future.' They do not claim that Israel has agreed to accept him (or routinely accepts deportees) or describe any other actions taken to effectuate [petitioner's] removal to Israel in the 189 days he has been detained in immigration custody."); *see* also *Shamma v. Raycraft*, 2026 WL 598451, (W.D. Mich. March 4, 2026) (rejecting ICE's assertion that stateless Palestinian's removal was reasonably foreseeable "because Israel will take stateless subjects and transfer to Palestine via the West Bank"; the record contained no documents showing Israel had accepted the crossing request, and even if it had, there was no set timeline for the removal).

When addressed at the hearing, the Government stated that Omar would be removed by a non-commercial flight, but the Government stated that it did not have any information regarding the allegedly chartered flight or its allegedly scheduled departure date in June. But in the Government's written Response—filed within

---

Petitioner's release" months earlier on July 12, 2025."); *Simmaphilavong v. Noem*, No. 26-458, 2026 WL 593146, at *1 (W.D. Wash. Mar. 3, 2026) (granting habeas relief under similar facts: "On or about January 5, 2026, Petitioner's OSUP was revoked." However "travel documents were [only] issued by Laos on January 30, 2025. But they have not provided copies of any such documents to the Court" or Petitioner. "On February 23, 2026, Petitioner was served a Notice of Imminent Removal . . . with removal planned for an unspecified day in March 2026."); *Tran v. Lyons*, No. 26-11036, 2026 WL 788242, at *3 (D. Mass. Mar. 20, 2026) ("Applying the factors enumerated in 8 C.F.R. § 241.13(f), Respondents have provided no information that, at the time of the arrest, Respondents had made any efforts to remove Petitioner to Vietnam."); *Gomes-Afonseca v. Lyons*, No. 26-10215, 2026 WL 538167, at *2 (D. Mass. Feb. 26, 2026) ("Where ICE is attempting to re-detain a noncitizen, this individualized determination must be conducted prior to re-detention.").

hours of the hearing—the Government suggested that it is unable to provide what should be readily available information, explaining:

> For security reasons and to protect law enforcement personnel, ICE does not share specific charter flight information or dates of removal, particularly to Israel.

(Doc. 35 at 9 n.12). Not only is the Government's explanation unsupported by any evidence in the record, but it appears to acknowledge that traveling to Israel is currently unsafe.[15] Further, the Government never mentioned at the hearing that "security reasons" prevented the disclosure of the alleged details surrounding Omar's removal, rather than the information's seeming lack of existence.

The Government has also failed to provide details regarding how Omar would be escorted to the West Bank from Israel and made no assurance that the Palestinian Authority would then even accept him. Glaringly absent from the Government's briefing is any overt acknowledgement of the ongoing military crisis in the area,

---

[15] The U.S. Department of State currently provides the following travel advisory for Israel, the West Bank, and Gaza:

**Reconsider Travel To:**
- Israel due to **terrorism** and **civil unrest**
- West Bank due to **terrorism** and **civil unrest**

**Do Not Travel To:**
- Gaza due to **terrorism** and **armed conflict and within 11.3 km/7 miles of the Gaza Periphery**
- Northern Israel within **4 kilometers/2.5 miles of the Lebanese and Syrian borders** due to continued military presence and activity
- The Egyptian border within **2.4km/1.5 miles**, except for the Taba crossing, which is open

*See* U.S. DEP'T OF STATE, *Israel, the West Bank and Gaza Travel Advisory*, https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/israel-west-bank-and-gaza-travel-advisory.html (last visited May 29, 2026) (emphasis in original).

21

which other courts have recently found to be a significant barrier to removal, whether to Israel, Gaza, or the West Bank. *See Fadwa v. Lyons*, No. 25-3660, 2025 WL 3525026, at *5 (D. Colo. Dec. 9, 2025) ("ICE does not allege how [petitioner] will be escorted from Tel Aviv to the West Bank or Gaza, which could prove challenging due to the ongoing conflict. In fact, ICE does not allege that the Palestinian Authority has agreed to accept [petitioner] at all. Thus, the Court has good reason to believe that [petitioner] will not be removed in the reasonably foreseeable future."); *Thabata v. Blanche*, No. 26-531, 2026 WL 1397059, at *5 (W.D. Okla. May 19, 2026) ("Officer Foncha . . . admits that approvals from the Government of Israel generally take 3-6 months or longer but he believes that [p]etitioner's removal is significantly likely in the reasonably foreseeable future. Courts have often rejected conclusory statements, such as those from Officer Foncha. . . . [And] [a]s Petitioner points out, Israel is actively involved in a war against, at minimum, Iran and Lebanon in recent weeks, and is consequently less likely than ever before to get around to facilitating [transit] requests for stateless Palestinians in the reasonably foreseeable future."); *Thabateh v. King*, No. 25-14018, 2026 WL 1121927, at *4 (E.D. Mich. April 24, 2026) ("[T]here is no significant likelihood of removal in the reasonably foreseeable future. This is because immigration officials were previously unable to remove [petitioner] in 2023 and . . . during his more recent detention, officials again failed to effectuate removal . . . because of the lack of proper travel documentation/approval. Ultimately, it is reasonable given these circumstances that [petitioner's] lack of a currently-valid

22

Israeli passport, in conjunction with continuing conflict in the region, present barriers that have prevented removal already and bar removal over the reasonably foreseeable future."); *Awad v. ICE*, No. 25-2751, 2026 WL 1194717 (N.D. Ohio May 1, 2026) (finding that petitioner's removal was not reasonably foreseeable given that ICE was previously unsuccessful in removing petitioner to Israel when there was not an ongoing war, the current lack of travel documents or approval from Israel, the lack any date for the referenced charter flight, and the ongoing military conflict); *Abuelhawa v. Noem*, 811 F. Supp. 3d 847, 860 (S.D. Tex. 2025) ("Suggestion of return in the reasonably foreseeable future of a Palestinian national to any of Jordan, Israel, or a Palestinian territory is objectively specious, especially where the record includes prior rejection of attempt at removal in times of less strife, paired with subsequent and recent rejection of requests, even if such rejections can be attributed to mere inaction of the putative receiving country.").

AFOD Ward further indicates that Omar's removal is contingent on his medical condition and clearance from his doctors. (Doc. 26-4 at 4). As noted, Omar recently underwent a triple bypass open heart surgery and then suffered two heart failures while in cardiac rehabilitation, which he was discharged from less than one week ago. "At the risk of stating the obvious, a chance of removal within an unspecified period of time is not the same as a significant likelihood of removal in the reasonably foreseeable future." *Siguenza v. Moniz,* No. 25-11914, 2025 WL 2734704,

23

at *3 (D. Mass. Sept. 25, 2025).[16] For these reasons, the Government has failed to meet its burden of showing that Omar's removal is reasonably foreseeable, now or at the time of his re-detention.

### B. Unlawful Prolonged Detention.

Second, Omar's prolonged detention is unlawful. In *Zadvydas*, the United States Supreme Court held that 8 U.S.C. § 1231(a)(6) "does not permit indefinite detention." 533 U.S. at 689. Rather, it allows detention only for "a period reasonably necessary to bring about that [noncitizen]'s removal from the United States." *Id*. "[O]nce removal is no longer reasonably foreseeable, continued detention is no longer authorized by statute." *Id*. at 699. The Supreme Court in *Zadvydas* "recognized a presumptively—not categorically—reasonable [6-month] period of detention," and acknowledged that Congress "doubted the constitutionality of more than six months' detention[.]" *Zadvydas*, 533 U.S. at 680; *Puertas-Mendoza v. Bondi*, No. 25-890, 2025 WL 3142089, at *2 (W.D. Tex. Oct. 22, 2025),

*Zadvydas*' 6-month period does not reset each time the government re-detains a noncitizen. Instead, in a re-detention case like this one, the relevant period of post-removal detention includes not only the current detention, but prior detentions as well. *See Villanueva v. Tate*, 801 F. Supp. 3d 689, 702 (S.D. Tex. 2025) ("The [G]overnment's contention that it may avoid the holding of *Zadvydas* and re-start the six-month presumptively constitutional detention clock by simply releasing and then

---

[16] *See also Balza v. Barr*, No. 20-866, 2020 WL 6143643, at *5 (W.D. La. Sept. 17, 2020) (habeas granted where timing of noncitizen's removal was speculative, noting the uncertainty created by "worldwide travel restrictions due to the global COVID-19 pandemic make it nearly certain that ICE will not be able to do so for the foreseeable future.").

re-detaining a noncitizen has no basis in either the statutes, the regulations, or *Zadvydas* itself.").[17]

Here, Omar has been held in ICE detention since October 28, 2025—7 full months—with no end in sight. ***This detention alone exceeds the Zadvydas period***. ICE previously detained Omar from 2005 to 2006 for nearly 4 months. In total, ICE has detained Omar for 11 months—well beyond *Zadvydas'* 6-month presumptively reasonable period—and ICE has still not accomplished his removal. This provides yet another independent reason warranting habeas relief. *See Zadvydas*, 533 U.S. at 701 ("After this 6-month period, once the [noncitizen] provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing.").

The Court pauses to emphasize that 20 years have passed between ICE's 2005 and 2025 detentions of Omar, in which ICE did ***nothing*** to effectuate Omar's removal. Even when Omar complained of symptoms for 3 weeks before suffering a heart attack while in ICE custody, ICE still refused to release him. Then, Omar

---

[17] In other words, the *Zadvydas* period is cumulative. *See Abuelhawa v. Noem*, 811 F. Supp. 3d 847, 855–56 (S.D. Tex. 2025) (collecting cases) ("Most courts to consider the issue have concluded that the *Zadvydas* period is cumulative, motivated by a concern that the federal government could otherwise detain aliens indefinitely by continuously releasing and re-detaining them."); *Rodriguez Romero*, -- F. Supp. 3d -- , 2026 WL 321437, at *13 ("To consider only the current period of detention would be to allow the Government to indefinitely detain noncitizens through successive detentions, at direct odds with *Zadvydas*'s protection against indefinite detention."); *Chen v. Holder*, No. 14-2530, 2015 WL 13236635, at *2 (W.D. La. Nov. 20, 2015) (wholly rejecting Government's argument that "petitioner's prior detention in Louisiana should not be counted, as *Zadvydas* does not allegedly address breaks in detention, but rather was allegedly concerned with continuous detention.").

suffered a heart attack 6 months into his current detention. Yet ICE has doubled down, returning Omar from a cardiac rehabilitation facility to another ICE detention facility, with stated plans to remove him (despite no evidence supporting ICE's assertion).

### C. Orderly Departure.

Finally, even if ICE had complied with its own regulations when it re-detained Omar on October 28, 2025, his re-detention would still be unlawful. Both Omar's 2006 OSUP, and the Fifth Amendment to the United States Constitution, entitle him to an "orderly departure." (Doc. 26-2 at 49); *see also Rombot*, 296 F. Supp. at 388 (ICE "violated the Due Process Clause of the Fifth Amendment when it detained [petitioner] . . . . [Petitioner] did not violate any condition of his release, but was not given 'an opportunity to prepare for an orderly departure' as specifically provided in the Release Notification.  . . . ICE ignored that condition and placed [petitioner] in shackles . . . .").[18]

The Release Notification accompanying Omar's 2006 OSUP provided:

Once a travel document is obtained, you will be required to surrender to ICE for removal. You will, at that time, be given an opportunity to prepare for an orderly departure.

---

[18] *See also Nak Kim Chhoeun v. Marin*, 442 F. Supp. 3d 1233, 1251 (C.D. Cal. 2020) (Considering their "long-dormant removal orders . . . to protect [p]etitioners' due process rights, the [G]overnment must give them notice before re-detaining them for purposes of removal. . . . The added safeguard of notice also provides the additional value of allowing Petitioners to say goodbye to their families, and wrap up their affairs, including ensuring adequate care for their loved ones and notifying their employers.").

26

(Doc. 26-2 at 49). ICE "cannot now renege on the promise such that its words meant nothing." *Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 170 (W.D.N.Y. 2025). As one court explained:

> The idea that ICE would be justified in lying to such people about such a small but profound thing—the freedom to say goodbye . . . the freedom to put a few photos of loved ones in your pocket, as this Court suggested at oral argument—boggles the mind. In such circumstances, a ruse disguised as a promise is not a tool for effective law enforcement—it is manifest cruelty. The Constitution commands better.

*Ceesay*, 781 F. Supp. 3d at 169.

While the term "orderly departure" is not defined, courts interpreting similar language in notices of release have found that it entitles a noncitizen to a reasonable opportunity to prepare for removal outside of detention. *See id.* ("The Court agrees with [petitioner] that the promise of an orderly departure cannot mean nothing. The Court finds that such a promise must include—at a minimum—the chance to make some preparations for serious healthcare concerns and perhaps the chance to pack certain belongings."); *Ragbir v. Sessions*, No. 18-236, 2018 WL 623557, at *2 (S.D.N.Y. Jan. 29, 2018), *vacated and remanded on other grounds. Ragbir v. Barr*, No. 18-1595, 2019 WL 6826008 (2d Cir. July 30, 2019) ("[W]hen this country allowed petitioner to become a part of our community fabric, allowed him to build a life with and among us and to enjoy the liberties and freedom that come with that, it committed itself to allowance of an orderly departure when the time came.").

Omar's "interest in due process[] required that we not pluck him out of his life . . . remove him from his family and community without a moment's notice. . . . The process that is due here is the allowance that he know and understand that the time

27

has come, that he must organize his affairs, and that he do so by a date certain. That is what is due. That is the process required after a life lived among us." *Ragbir*, 2018 WL 623557, at *2. When and if the time comes, ICE must give Omar that opportunity, and its definition of "an orderly departure" must be reasonable.

## III.    CONCLUSION

Accordingly,

**IT IS ORDERED** that the Petition for Writ of Habeas Corpus (Doc. 1) is **GRANTED** and ICE is **ORDERED** to release Petitioner from custody within 8 hours of the issuance of this Ruling and Order.

**IT IS FURTHER ORDERED** that Omar will be released pursuant to the same conditions in place at the time of his re-detention on October 28, 2025 (as outlined in his 2006 Order of Supervision and Notice of Release). This will include the condition that Omar is entitled to an Orderly Departure and that Omar will only be required to surrender to ICE once a travel document is obtained.

**IT IS FURTHER ORDERED** that ICE will return Omar's property to him, including any identifying documents or passport, and that ICE will issue to Omar personally a physical copy of the Order of Supervision and Notice of Release.

**IT IS FURTHER ORDERED** that ICE shall immediately provide Omar with a copy of this Ruling and Order and notify Omar that he will be released pursuant to this Order, including the date and time of his release.

28

**IT IS FURTHER ORDERED** that ICE shall immediately provide Omar with free access to a phone so that he may contact family and his attorney to alert them of his upcoming release and otherwise make arrangements to return home.

**IT IS FURTHER ORDERED** that ICE shall provide Petitioner with a full copy of his medical records immediately upon his release. ICE shall also facilitate communication between the medical providers Petitioner saw while in ICE custody, the medical providers Petitioner will see once out of ICE custody, and Petitioner and his family, to ensure the most efficient and effective continuation of his required medical treatment upon his release from ICE custody.

**IT IS FURTHER ORDERED** that ICE shall not re-detain Petitioner without due process of law, in accordance with this Ruling and Order.

**IT IS FURTHER ORDERED** that if and when ICE is able to effectuate Omar's removal, ICE will provide Omar with an opportunity to prepare for an Orderly Departure outside of ICE custody. ICE's definition of what constitutes an Orderly Departure must be reasonable under the circumstances.

**IT IS FURTHER ORDERED** that the Government shall file a Notice of Compliance with this Ruling and Order within 24 hours of Omar's release. This Notice of Compliance will specify the date and time of Omar's release.

**IT IS FURTHER ORDERED** that the Government's Counsel of Record is responsible for immediately notifying ICE of this Ruling and Order.

**IT IS FURTHER ORDERED** that Petitioner's **Motion for Leave to File Memorandum in Support of Motion in Limine and to Strike Incorrectly**

29

**Filed Document (Doc. 17)** is **GRANTED.** The Clerk of Court shall file Petitioner's proposed pleading (Doc. 17-1) to accompany Petitioner's Motion in Lime (Doc. 8). The Clerk of Court shall strike Doc. 15 from the record.

**IT IS FURTHER ORDERED** that Petitioner's **Motion for Leave to File Reply to Government's Opposition to Motion in Limine (Doc. 37)** is **GRANTED.** The Clerk of Court shall file Petitioner's proposed pleading (Doc. 37-1) as a separate docket entry.

**IT IS FURTHER ORDERED** that Petitioner's previously filed **Motion for Leave to File Reply to Government's Opposition to Motion in Limine (Doc. 36)** is **DENIED AS MOOT.**

**IT IS FURTHER ORDERED** that Petitioner's **Motion in Limine Regarding Evidence in Response to Petition for Writ of Habeas Corpus (Doc. 8)** is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that **Petitioner's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. 12)** is **DENIED AS MOOT**.

Baton Rouge, Louisiana, this 29th day of May, 2026

**JUDGE BRIAN A. JACKSON**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**